UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| SENIOR CARE CENTERS, LLC, et al., | § | |
| | § | |
| Debtors, | § | |
| | § | |
| ------------------------------------------------- | § | |
| | § | |
| HARDEN HEALTHCARE LLC, | § | |
| | § | CIVIL ACTION NO. 3:19-CV-2722-B |
| Appellant, | § | |
| | § | |
| v. | § | |
| | § | |
| OLP WYOMING SPRINGS LLC; SENIOR | § | |
| CARE CENTERS LLC; and PM | § | |
| MANAGEMENT-ROUND ROCK AL | § | |
| LLC, | § | |
| | § | |
| Appellees. | § | |

## MEMORANDUM OPINION AND ORDER

Appellant Harden Healthcare LLC ("Harden") appeals a final order of the United States

Bankruptcy Judge Stacey Jernigan approving a settlement agreement between Debtor Senior Care

Centers LLC, Debtor PM Management-Round Rock AL LLC, and OLP Wyoming Springs LLC

("OLP"). For the reasons that follow, the ruling of the bankruptcy court is **AFFIRMED** in all

respects. This appeal is **DISMISSED WITH PREJUDICE**.

## I.

## BACKGROUND

This appeal arises from the Chapter 11 bankruptcy of Senior Care Centers LLC and PM Management-Round Rock AL LLC ("Debtors"). Debtors operate skilled-nursing and assisted-living facilities around the country. One of the assisted-living facilities Debtors operated is called Wyoming Springs Assisted Living and Memory Care ("Wyoming Springs"). Doc. 2-1, R., 11. Debtors leased the premises for Wyoming Springs from OLP. *Id.* Harden guaranteed the lease. *Id.* at 12.

Debtors filed voluntary petitions for Chapter 11 bankruptcy on December 4, 2018. *Id.* at 22; *In re PM Management - Round Rock AL, LLC*, No. 18-3397-sgj11 (Bankr. N.D. Tex. Dec. 4, 2018), ECF No. 1. As described by Debtors, their "restructuring strategy was to reject the leases at unprofitable locations and restructure around the profitable facilities." Doc. 8, Debtors' Br., 12 (citing Doc. 2-4, R., 693–833). Accordingly, Debtors rejected the Wyoming Springs lease on February 28, 2019. *See* Doc. 2-1, R., 83, 100.

According to Debtors, "new operators" were found "for virtually all of the facilities" whose leases Debtors rejected. Doc. 8, Debtors' Br., 12. However, instead of negotiating to transfer operations of Wyoming Springs to a new entity, OLP and Debtors became "embroiled in contested litigation on a number of fronts[.]" Doc. 7, OLP Br., 4; *see also* Doc. 8, Debtors' Br., 12 (stating that after Debtors rejected the Wyoming Springs lease, OLP "pursued a relentless onslaught of hyper-aggressive litigation"). To start, OLP filed a proof of claim against the estate—a general unsecured claim for $2,797,610.64 in damages arising from the rejection of the lease. Claim No. 39, *In re Senior Care Ctrs., LLC*, No. 18-33967-sgj11 (Bankr. N.D. Tex. Feb. 11, 2019), Claim Register No. 39-1. Additionally, OLP objected to various forms of relief Debtors sought in the bankruptcy case. *See, e.g.,*

Doc. 2-1, R., 46, 92, 218–19, 233, 278. Finally, OLP appealed a tax ruling in favor of Debtors and initiated an adversary proceeding against Debtors in August 2019. *Id.* at 181, 203, 220, 266.

At an August 27, 2019, evidentiary hearing, Debtors and OLP announced that they had reached a global settlement of all their disputes ("the Settlement Agreement"). *See* Doc. 9-2, Debtors' App., 94.[1] The terms of the Settlement Agreement were discussed on the record at the August 27 hearing. Doc. 9-2, Debtors' App., 113–28. The terms announced at the August 27 hearing included a "mutual release[]" of "any claims arising from or relating to what has been euphemistically referred to as the document breach . . . involving the former executive director of the facility[.]" *Id.* at 119.

The "document breach" to which the Settlement Agreement refers is an alleged Health Insurance Portability and Accountability Act ("HIPAA") violation that occurred earlier in the summer. *See* Doc. 3, Harden Br., 11–14; Doc. 7, OLP Br., 5. Apparently, the executive director at Wyoming Springs released documents containing HIPAA-protected patient information to the potential successor operator of Wyoming Springs and to OLP's broker. Doc. 7, OLP Br., 5. Harden points to an email from an associate of counsel for Debtors addressed to counsel for OLP stating that the documents released "contained patient names, social security numbers, and various intimate health information" and acknowledging that OLP "willfully solicited" those documents knowing their release would amount to a privacy violation. *See* Doc. 2-2, R., 535. Thus, according to Harden, OLP may be liable to Debtors for its role in a HIPAA violation. *See id.* Regardless of OLP's role in

---

[1] Though the transcript of the August 27 hearing is not part of the official record on appeal, the Court may take judicial notice of bankruptcy court records that "cannot reasonably be questioned in deciding a bankruptcy appeal." *Freewood Grp., LLC v. Park Place Motorcars, Ltd.*, 2018 WL 4002475, at *8 n.5 (N.D. Tex. Aug. 22, 2018).

soliciting the documents, however, it later became clear that the information released was likely only a "rent roll" intended to assure the potential buyer of Wyoming Springs that the facility was properly collecting money from its tenants. Doc. 2-3, R., 623–24, 633.

Following the August 27 hearing, Debtors and OLP finalized the terms of the Settlement Agreement, including the release of claims arising from the HIPAA violations, and on October 8, 2019, Debtors filed a motion seeking expedited consideration and approval of the Settlement Agreement. Doc. 2-2, R., 403–26. Among other things, the Settlement Agreement provided that OLP would: (1) accept a reduced administrative expense priority claim of $1,400,000 (down from over $2,000,000), which would be deemed satisfied by the application of a $584,000 security deposit; (2) withdraw all pending motions in the bankruptcy case and dismiss its pending adversary proceeding; (3) dismiss its pending appeal of the tax ruling; and (4) support confirmation of Debtors' proposed plan of reorganization. *Id.* at 413–14.

On October 11, 2019, Debtors filed a corresponding motion for expedited entry of an order approving the operations transfer agreement ("OTA") under which Wyoming Springs would transfer to a new operator. *Id.* at 429–506. On October 22, 2019—fourteen days after the finalized Settlement Agreement was filed and eleven days after the finalized OTA was filed—the bankruptcy court held an expedited hearing on the Settlement Agreement and the OTA. Doc. 2-1, R., 333–34. At the October 22 hearing, the bankruptcy court heard testimony from Debtors' chief restructuring officer, Mr. O'Halloran, and heard oral argument from counsel as to the merits of approving the Settlement Agreement. *See generally* Doc. 2-3, R., 596–638. The bankruptcy court overruled Harden's objections as to the expedited nature of the hearing and as to approval of the Settlement Agreement. *Id.* at 636–37. The bankruptcy court ultimately approved the Settlement Agreement and

entered an order to that effect on October 25, 2019. Doc. 2-1, R., 5–8. Harden timely appealed from that order on November 8, 2019. *Id.* at 1–4.

Harden raises three related issues on appeal. First, Harden argues that the bankruptcy court was not fully apprised of the facts underlying the Settlement Agreement—particularly, the degree of Debtors' potential exposure for the HIPAA violation. Doc. 3, Harden Br., 7–8. Second, Harden argues the bankruptcy court erred in conducting an expedited hearing on the Settlement Agreement and the OTA without ordering additional discovery into the basis for the settlement. *Id.* at 8. Third, Harden suggests that the bankruptcy court erred generally in approving the Settlement Agreement. *Id.* at 9. OLP responds to each of Harden's points of error. *See generally* Doc. 7, OLP Br. Like OLP, Debtors respond to each of Harden's points of error, but they also raise the additional argument that this appeal is equitably and statutorily moot. Doc. 8, Debtors' Br., 23–27. Harden filed a reply brief in support of its appeal. *See* Doc. 10, Harden Reply. The appeal is fully briefed and ripe for review.

## II.

## LEGAL STANDARD

Final judgments, orders, and decrees of a bankruptcy court may be appealed to a federal district court. 28 U.S.C. § 158(a). Because the district court functions as an appellate court in this scenario, it applies the same standards of review that federal appellate courts use when reviewing district court decisions. *In re Webb*, 954 F.2d 1102, 1103–04 (5th Cir. 1992). Thus, a district court reviews the bankruptcy court's findings of fact for clear error and its conclusions of law or mixed questions of law and fact *de novo*. *In re McLain*, 516 F.3d 301, 307 (5th Cir. 2008); *In re SI Restructuring, Inc.*, 542 F.3d 131, 135 (5th Cir. 2008). A factual finding is clearly erroneous when, "although there is evidence to support it, the reviewing court on the entire evidence is left with a

definite and firm conviction that a mistake has been committed." *In re Braniff Airways, Inc.*, 783 F.2d 1283, 1287 (5th Cir. 1986) (quoting *Anderson v. City of Bessemer City*, 470 U.S. 564, 573 (1985)). It is insufficient that the reviewing court, upon examining the evidence, would merely have decided differently if sitting as the trier of fact. *Id.* (quoting *Anderson*, 470 U.S. at 573). In conducting a "clear error" review, the court must give due regard to the opportunity of the bankruptcy judge to determine the credibility of the witnesses. *In re Dennis*, 330 F.3d 696, 701 (5th Cir. 2003). *De novo* review of the bankruptcy court's conclusions of law, on the other hand, "requires this court to make a judgment independent of the bankruptcy court's, without deference to that court's analysis and conclusions." *In re Lawler*, 106 B.R. 943, 952 (N.D. Tex. 1989) (citing *Moody v. Amoco Oil Co.*, 734 F.2d 1200, 1210 (7th Cir. 1984)).

## III.

## ANALYSIS

The Court begins by addressing Debtors' contention that this appeal is moot. Finding that the appeal is not moot, the Court turns to the merits of the appeal. The Court first addresses Harden's contention that the bankruptcy court erred in expediting consideration of the Settlement Agreement, including Harden's position that the bankruptcy court should have ordered further discovery before approving the Settlement Agreement. Finally, the Court addresses Harden's argument that the bankruptcy court erred in approving the Settlement Agreement, including Harden's contention that the bankruptcy court was not adequately apprised of the facts underlying the Settlement Agreement. Finding no error on the part of the bankruptcy court, this Court **AFFIRMS** the bankruptcy court's approval of the Settlement Agreement in all respects and **DISMISSES** Harden's appeal **WITH PREJUDICE**.

A.    *This Appeal Is Not Moot.*

In their brief, Debtors raise the issue of mootness. Doc. 8, Debtors' Br., 8. Particularly, Debtors posit that this appeal should be "dismissed as moot under the doctrines of equitable and statutory mootness because Harden failed to obtain a stay pending appeal, the Debtors' plan has been substantially consummated, and all of the transactions contemplated under the Settlement Agreement and OTA Order have occurred and cannot be unwound." *Id.* at 23 (footnote omitted). The Court disagrees.

1.    Equitable Mootness

The doctrine of equitable mootness "prevent[s] appeals that threaten to unravel a particularly interrelated confirmation plan." *Matter of Sneed Shipbuilding, Inc.*, 916 F.3d 405, 407 (5th Cir. 2019) (citing *In re Manges*, 29 F.3d 1034, 1038–39 (5th Cir. 1994)). It "allows courts to abstain from appeals of plan confirmation orders, allowing the interrelated web of parties to rely on a final decision." *Id.* at 408. In the Fifth Circuit, courts should be "hesitant to invoke equitable mootness" and should "treat[] it as a 'scalpel rather than an axe.'" *Id.* at 409 (quoting *In re Pac. Lumber Co.*, 584 F.3d 229, 240 (5th Cir. 2009)).

In determining whether a matter is equitably moot, a court considers the following three factors: "(1) whether a stay has been obtained, (2) whether the plan has been substantially consummated, and (3) whether the relief requested would affect either the rights of parties not before the court or the success of the plan." *In re San Patricio Cnty. Cmty. Action Agency*, 575 F.3d 553, 558 (5th Cir. 2009) (internal quotations omitted) (quoting *In re Manges*, 29 F.3d at 1039).

This appeal is not equitably moot. First, Harden does not appeal the confirmation of a bankruptcy *plan*; rather, it appeals the approval of a settlement of claims against the estate and Debtors. While the Fifth Circuit has recognized that "some courts outside [the] circuit have employed equitable mootness when reviewing settlement agreements, not just plan confirmations, in particularly messy cases," it has declined "to expand equitable mootness into [such a] new frontier[]." *Sneed*, 916 F.3d at 409. Debtors supply no authority that suggests this Court should apply the doctrine of equitable mootness to the bankruptcy court's order approving the Settlement Agreement.

Moreover, even if this Court were inclined to find that equitable mootness extends to settlement agreements, this is not a "particularly messy case" warranting application of the doctrine. *See id.* Indeed, "[e]quitable mootness is aimed at limiting review of complex plans whose implementation has substantial secondary effects." *Id.* (citation omitted). And "this settlement and sale [are] not sufficiently complex." *Id.* As the Court will discuss below, it is unclear on this record whether the sale at issue has been consummated in the first place. *See infra* Section III.A.2. But even if it has, unwinding it would simply involve transferring ownership of the nursing home back to the estate. As Harden points out, "Debtors have not provided evidence that potentially having to litigate with OLP would substantially impact the plan, nor that any specific third parties actually based their support of the plan on the Settlement Order." Doc. 10, Harden Reply, 11. This matter is not equitably moot.

2.    Statutory Mootness

"Section 363(m) patently protects, from later modification on appeal, an authorized sale where the purchaser acted in good faith and the sale was not stayed pending appeal." *In re O'Dwyer*,

611 F. App'x 195, 199 (5th Cir. 2015) (per curiam) (quoting *Gilchrist v. Westcott (In re Gilchrist)*, 891 F.2d 559, 560 (5th Cir. 1990)). The doctrine of statutory mootness thus "limits the ability of appellate courts to review the sale of estate property when the order approving the transaction is not stayed." *Sneed*, 916 F.3d at 409 (citing 11 U.S.C. § 363(m)). The doctrine assures buyers of estate property that "once the bankruptcy court approves the sale and it is consummated (that is, the order is not stayed), then no appellate court can later second-guess the deal." *Id.* at 409–10.

Even though Harden does not appeal the order approving the OTA, Debtors contend that statutory mootness applies because that order "is inextricably intertwined with the Settlement Order[,]" and "[t]here is no way to sever the settlement from the sale, as the settlement was a necessary prerequisite for the sale to proceed." Doc. 8, Debtors' Br., 27. But Debtors only baldly assert that "the sale transaction under the OTA Order has closed." *Id.* It is not clear to the Court that this is accurate.

Debtors cite no closing documents or otherwise prove that the sale has closed. Nor do the documents in the record related to the sale clearly indicate whether the sale has closed. First, the order approving the OTA states that it "is effective and enforceable immediately upon entry, no stay applies, and the Debtors *may* complete the transactions contemplated hereby immediately." Doc. 9-2, Debtors' App., 140 (emphasis added). Further, while the OTA defines a 9019 Order as a "final and non-appealable order of the Bankruptcy Court settling, releasing, and discharging any and all Claims . . . of Landlord under, and in any way relating to, the real property lease covering the facility . . . ," Doc. 2-2, R., 476, it does not indicate that a 9019 Order triggers closing. Thus, the documents attendant to the sale of Wyoming Springs to a new operator suggest that the sale *may* have closed; however, they do not establish that it has.

Moreover, the Settlement Agreement, the basis for the appeal, states that its "effective date" is the "date of entry of a final, nonappealable order by the Bankruptcy Court approving, implementing, and authorizing the Debtors to undertake the terms of" the agreement. *Id.* at 414. The order approving the Settlement Agreement is *currently* on appeal. Thus, it is clearly not a final, nonappealable order. By its own terms, the Settlement Agreement is not yet effective. Harden posits, and the Court agrees, that if the Settlement Agreement and the OTA are "inextricably intertwined" and "necessary prerequisite[s]" of each other as Debtors suggest, then the sale of Wyoming Springs has likely not closed. Doc. 8, Debtors' Br., 27. In any event, given the lack of certainty as to whether the sale at issue has closed, the Court declines to find this appeal statutorily moot.

Declining to dismiss this appeal as moot, the Court now addresses the issues Harden raises.

B.    *The Bankruptcy Court Did Not Abuse Its Discretion in Expediting the Hearing.*

Harden appeals on the ground that the bankruptcy court "err[ed] in conducting an expedited hearing on the proposed settlement[, thus] . . . [i]mprovidently [r]ush[ing] its [r]uling[.]" Doc. 3, Harden Br., 8, 22. Relatedly, Harden states that the bankruptcy court erred in approving the Settlement Agreement without permitting Harden to conduct further discovery. *Id.* at 23–24. The Court disagrees with both contentions.

Under the Federal Rules of Bankruptcy Procedure, the debtor, trustee, and all creditors are entitled to "at least 21 days' notice by mail of . . . the hearing on approval of a compromise settlement . . . , unless the court for cause shown directs that notice not be sent[.]" Fed. R. Bankr. P. 2002(a)(3). "The purpose of the notice requirement of Rule 2002 is to provide parties with a pecuniary interest in the settlement an opportunity to object to a settlement agreement that is unsatisfactory." *In re Triple E Transp., Inc.*, 169 B.R. 368, 373 (E.D. La. 1994) (citation omitted).

"Significantly, [the appellate court] may find that the [b]ankruptcy [c]ourt had good cause to shorten the notice period even where the [b]ankruptcy [c]ourt does not expressly make findings of good cause." *Advantage Healthplan, Inc. v. Potter*, 391 B.R. 521, 551 (D.D.C. 2008), *aff'd sub nom. Greater Se. Cmty. Hosp. Found. Inc. v. Potter*, 586 F.3d 1 (D.C. Cir. 2009) (citing *Triple E Transp.*, 169 B.R. at 373). A trial court's ruling regarding "scheduling matters" is reviewed for "abuse of discretion." *Brown v. DFS Servs., L.L.C.*, 434 F. App'x 347, 350 (5th Cir. 2011); *see also In re S. Willow Creek Farm*, 1999 WL 1244511, at *1 (10th Cir. B.A.P. 1999) (table opinion) (applying abuse-of-discretion standard to the bankruptcy court's decision to reduce the time for a hearing). Likewise, a bankruptcy court's "decision to limit discovery is reviewed for abuse of discretion." *See In re Linn Energy, L.L.C.*, 936 F.3d 334, 345 (5th Cir. 2019).

Here, the bankruptcy court shortened the required hearing notice time frame from twenty-one days to fourteen days, expressly finding that the notice period was "not egregiously" shortened and that "notice [was] sufficient under the circumstances, particularly where . . . the pertinent terms of th[e] settlement" were heard "almost two months" prior. *See* Doc. 2-3, R., 608. The Court considers this an express finding of cause to shorten the notice period. But even if it is not, the Court finds that there was indeed cause to shorten the notice period. Thus, it was not an abuse of discretion to hold an expedited hearing.

As the bankruptcy court noted on the record at the hearing, the terms of the settlement were announced at a hearing on August 27, 2019, almost two months prior to the hearing on the settlement. Doc. 9-2, Debtors' App., 113–28 (announcing terms of settlement). The terms announced on the record at this hearing included a "mutual release[]" of "any claims arising from or relating to what has been euphemistically referred to as the document breach . . . involving the

former executive director of the facility[.]" *Id.* at 119–20. Counsel for Harden was present for the reading of these terms. *Id.* at 130 (reflecting counsel for Harden present at hearing); *id.* at 112 (noting that "[e]verybody can stay" to hear the terms of the agreement).

Thus, the purpose of the notice requirement—"to provide parties with a pecuniary interest in the settlement an opportunity to object to a settlement agreement that is unsatisfactory"—was satisfied. *Triple E Transp., Inc.*, 169 B.R. at 373. Given that the parties had notice of the terms of the settlement agreement on August 27, 2019, including that the Debtors' claims arising from the HIPAA breach would be released, there was cause to shorten the hearing notice period by seven days. *See Advantage Healthplan*, 391 B.R. at 551 ("Indeed '[a] bankruptcy procedural rule requiring notice is adequately complied with if a party not receiving formal notice receives actual notice and has an adequate opportunity to raise his objections.'" (quoting *In re Glinz*, 66 B.R. 88, 91 (D.N.D. 1986))). The Court declines to find it was an abuse of discretion by the bankruptcy court in expediting the hearing.

Likewise, the bankruptcy court's decision to approve the Settlement Agreement without allowing further discovery was not an abuse of discretion. As explained above, there was cause to shorten the notice period and conduct the hearing on an expedited basis. Thus, there was cause to conduct the hearing absent further discovery. Moreover, as explained more fully below, the bankruptcy court was properly apprised of the facts underling the Settlement Agreement when it approved the Settlement Agreement. *See infra* Section III.C.1. Thus, the Court finds no abuse of discretion in the bankruptcy court's limiting further discovery.

C.    *The Bankruptcy Court Did Not Abuse Its Discretion in Approving the Settlement Agreement.*

Harden suggests that the bankruptcy court erred in approving the Settlement Agreement, generally. Doc. 3, Harden Br., 9. Harden further posits that the bankruptcy court erred in not fully apprising itself of the extent of Debtors' exposure arising out of OLP's HIPAA violation before approving the Settlement Agreement. *Id.* at 7–8. The Court disagrees.

It is well-settled that a bankruptcy court's order approving a settlement agreement is reviewed for abuse of discretion. *In re Foster Mortg. Corp.*, 68 F.3d 914, 917 (5th Cir. 1995) ("This Court should review the Bankruptcy Court's approval of the compromise settlement for abuse of discretion." (citing *In re Emerald Oil Co.*, 807 F.2d 1234, 1239 (5th Cir. 1987); *In re Jackson Brewing Co.*, 624 F.2d 599, 602–03 (5th Cir. 1980))); *See also In re Bodenheimer, Jones, Szwak, & Winchell L.L.P.*, 592 F.3d 664, 668 (5th Cir. 2009); *In re Age Refining, Inc.*, 801 F.3d 530, 539 (5th Cir. 2015); *DeepRock Venture Partners LP v. Beach*, 2017 WL 1293090, at *4 (N.D. Tex. Apr. 4, 2017), *aff'd sub nom. In re Beach*, 731 F. App'x 322 (5th Cir. 2018).[2] "[A] bankruptcy court abuses its discretion when it bases its decision on legally incorrect principles," *Bodenheimer*, 592 F.3d at 675, or on clearly erroneous facts. *See In re Cahill*, 428 F.3d 536, 539 (5th Cir. 2005).

"A bankruptcy court may approve a compromise settlement of a debtor's claim pursuant to Bankruptcy Rule 9019(a)." *Foster Mortg.* 68 F.3d at 917. Settlements should be approved "only when [they are] fair and equitable and in the best interest of the estate." *Id.* (citing, *inter alia*, *Jackson Brewing*, 624 F.2d at 602). Thus, the bankruptcy court "must compare the 'terms of the compromise with the likely rewards of litigation.'" *Id.* (quoting *Jackson Brewing*, 624 F.2d at 602). "When

_____

[2] No party acknowledges that the abuse-of-discretion standard applies to this issue. Doc. 3, Harden Br., 8; Doc. 7, OLP Br., 2; Doc. 8, Debtors' Br., 8–9.

considering a compromise settlement," bankruptcy courts in the Fifth Circuit must consider the following factors:

> (1) the probability of success in the litigation, with due consideration for the uncertainty in fact and law,
> (2) the complexity and likely duration of the litigation and any attendant expense, inconvenience and delay,
> . . .
> [(3)] the amount of creditor support for the compromise settlement[, and]
> . . .
> [(4) the] extent to which the settlement is truly the product of arms-length bargaining and not of fraud or collusion.

*Id.* at 917–18 (citing *Jackson Brewing*, 624 F.2d at 609). A court may also consider "all other factors bearing on the wisdom of the compromise." *Id.* at 917 (citing *Jackson Brewing*, 624 F.2d at 609).

The Court assesses each of these factors in turn and concludes that the bankruptcy court properly considered them in approving the settlement agreement. Thus, the bankruptcy court did not abuse its discretion.

### 1.    Probability of Success in the Litigation

Importantly, Harden does not assert that the bankruptcy court failed to properly assess OLP's probability of success on its claims against Debtors arising from Debtors' rejecting the Wyoming Springs lease—the claims that are resolved by the Settlement Agreement.[3] Rather, Harden's primary objection to the Settlement Agreement concerns the claims waived by Debtors against OLP arising from the HIPAA breach. Doc. 3, Harden Br., 19–20. Harden acknowledges that the bankruptcy court heard testimony from Mr. O'Halloran at the October 22 hearing regarding the HIPAA breach,

---

[3] Being that those claims were brought in the bankruptcy itself, and in an adversary proceeding before the bankruptcy court, this Court finds that the bankruptcy court was properly apprised of the facts underlying them and properly considered the likelihood of their success.

*Id.* at 14–15, but Harden posits that the evidence before the bankruptcy court was insufficient for it to evaluate the value of those claims. *Id.* at 19. According to Harden, the testimony of Debtors' CRO did not disclose "what information was released," "the range of possible losses that Debtors' could suffer as a result of the HIPAA violations, including by private negligence suits by patients," the degree of OLP's culpability, "[w]hat other statutes may have been violated," the potential cost "to litigate the HIPAA issues with OLP" and potential recoveries therefrom, the complexity of the potential litigation, and the "value to the estate . . . of preserving the claims against OLP[.]" *Id.*

But Harden ignores that "[u]nder the first [*Foster Mortgage*] factor, the court does not conduct a mini-trial, but the court does apprise itself of the relevant facts and law to make an informed decision." *In re Imperial Tooling & Mfg., Inc.*, 314 B.R. 340, 342 (Bankr. N.D. Tex. 2004); *see also In re Cajun Elec. Power Co-op, Inc.*, 119 F.3d 349, 356 (5th Cir. 1997) ("The judge need only apprise himself of the relevant facts and law so that he can make an informed and intelligent decision."). In any event, the bankruptcy court properly considered the potential merits of the claims by Debtors against OLP arising from the HIPAA breach.

Indeed, the bankruptcy court heard testimony that the entity that received the confidential information in violation of HIPAA would later become "entitled to" the information, as that entity is the buyer under the OTA. Doc. 2-3, R., 599, 623. Thus, Mr. O'Halloran testified that there would be "difficulty in obtaining damages" for the HIPAA violation. *Id.* at 599, 623. Moreover, the bankruptcy court heard testimony that the patient-related information released "wasn't specific medical information." *Id.* at 615. Rather, it was "a rent roll" that "did not include anything personal other than the name and the fact that" the individual was a facility resident. *Id.* at 623. In fact, Mr.

O'Halloran noted that the information released could have been gleaned by "walking through the facility" and simply observing the tenants' names on their doors. *Id.*

While Mr. O'Halloran admitted that Debtors are "still looking through to make sure there's nothing else out there" that has been released contrary to HIPAA, *id.* at 615, "[s]o far," all that has been discovered to have been released was the rent roll. *Id.* at 617–18. And the Debtors' "expectation is that there is nothing [more] there" because "so far" the investigation into further HIPAA breaches has "found nothing." *Id.* at 622.

In sum, Mr. O'Halloran testified:

We have made a determination that the exposure is a minimal exposure, if indeed it is considered to be an exposure. We obviously don't know what a regulator might impose as a fine. But assuming a reasonable regulator, and assuming that they did their work, they would see that the intent of the exchange of information was not giving fresh information out but was just a verification of information. And so we believe and we assume that the regulators would be reasonable, and therefore there would, if there was a fine, it would be minimal. Our expectation would – it would be no fine.

*Id.* at 626. Debtors' CRO based this conclusion in part on a conversation with a former regulator who likewise "did not see [the alleged HIPAA breach] as a big issue." *Id.* at 627.

Based on this evidence, the bankruptcy court overruled the pending objections to the Settlement Agreement, finding the arguments regarding the HIPAA violations "overblown." *Id.* at 637–38. Moreover, the bankruptcy court explicitly found that "the wisdom of the[] releases ha[d] been shown by the record[.]" *Id.* at 638. Aside from generally suggesting further discovery, Harden cites no particular evidence the bankruptcy court should have gathered or considered. And the Court does not credit Harden's speculations that "other statutes may have been violated" by the

HIPAA breach and that individual patients may bring "private negligence suits." Doc. 3, Harden Br., 19.

In sum, the bankruptcy court properly considered the likelihood of success of the claims at issue—those against OLP arising from the HIPAA violations being released by Debtors. Contrary to Harden's assertion, this Court finds that the bankruptcy court was properly apprised of the facts underlying those claims by the testimony of Mr. O'Halloran.

Harden's cited authority does not persuade the Court otherwise. Harden states that *Protective Committee for Independent Stockholders of TMT Trailer Ferry, Inc. v. Anderson (TMT Trailer)*, 390 U.S. 414 (1968) is "strikingly similar" to this case. Doc. 3, Harden Br., 20–21. But aside from quoting a portion of *TMT Trailer* where the Supreme Court vacated an order approving a compromise settlement in a bankruptcy matter for failure to properly evaluate potential claims, Harden does not explain how this case is "strikingly similar" to *TMT Trailer. Id.* (quoting *TMT Trailer*, 390 U.S. at 440–41). The Court finds that it is not.

*TMT Trailer* concerned a debtor that owned and operated a sea-going freight business. *TMT Trailer*, 390 U.S. at 419. The district court approved a plan of reorganization, which, among other things, permitted the claims of two particular creditors: the Caplan mortgage group and M–S, in full. *Id.* at 422–25. However, the trustee had previously concluded following an investigation that the debtor "had substantial causes of action against holders of the Caplan mortgage" for "gross mismanagement" of the debtor's business. *Id.* at 421. Moreover, the record suggested that M–S could be liable to the debtor for faulty design and repair of one of the debtor's ships. *Id.* at 429. Ultimately, the district court allowed both claims in full on the grounds that "the prospect of material reduction in the amount of these claims does not warrant the extensive litigation that would otherwise be

required[.]" *Id.* at 432–33. But importantly, in doing so, the district court did not make "reference to any of the objections that had been filed or to the substantial facts in the record tending to cast doubt upon the Caplan mortgage and M–S claims[.]" *Id.* at 433. Instead, the district court "accepted the bald conclusions of the trustee . . . *despite* the fact that the trustee had once concluded that the Caplan mortgage was null and void and that [the debtor] had sizeable setoffs against its holders [and] . . . the fact that the trustee had once sought [investigation] of the M–S claims[.]" *Id.* (emphasis added).

The Supreme Court found the district court's inquiry into the Caplan mortgage group's and M–S's claims insufficient, *id.* at 434, noting that "nothing in th[e] record indicate[d]" that the trial court ever "had before it facts which showed the claims against the Caplan mortgage and its holders to be without merit[.]" *Id.* at 437 . The record before this Court is not, as Harden suggests, "strikingly similar" to that of *TMT Trailer*. To the contrary, in *TMT Trailer*, there was "nothing in [the record] which could provide a sound basis for concluding that the claims against [Caplan] mortgage and its holders were unmeritorious." *Id.* at 436. Here, however, there is ample support for the bankruptcy court's conclusion that Debtors' potential claims against OLP arising from the HIPAA breach were unmeritorious. Namely, the bankruptcy court heard testimony from Mr. O'Halloran that the information revealed was just a rent roll. And the bankruptcy court made a finding to that effect. Moreover, there was testimony before the bankruptcy court indicating the information revealed was not medical information; rather, it was simply names and perhaps social security numbers. This evidence before the bankruptcy court provided "a sound basis for concluding" that Debtors' potential claims against OLP were unmeritorious. *Id.*

-18-

Nor is this case like *TMT Trailer* with respect to the M–S claims. This Court acknowledges that the Supreme Court admonished the district court's lack of investigation into the M–S claims. But a lack of investigation is not what occurred here. Again, during a substantial portion of a day-long hearing, the bankruptcy court heard competent testimony of Mr. O'Halloran and considered the objections to the Settlement Agreement. The Court does not deem this an abuse of discretion.

Harden also cites *In re Missionary Baptist Foundation of America Inc.*, 796 F.2d 752, 761 (5th Cir. 1986), for the proposition that a bankruptcy court must make sufficient factual determinations on which an appellate court can base its review. Doc. 3, Harden Br., 21. Be that as it may, the bankruptcy court made sufficient factual findings here.

Finally, Harden cites *In re Fugazy*, 150 B.R. 103, 106 (Bankr. S.D.N.Y. 1993), for the proposition that a "proposed settlement must be found to be reasonably equivalent to the value of the potential claim which would be surrendered as a result of the settlement." *Id.* Harden cites no further authority indicating this rule applies in the Fifth Circuit. For the reasons explained above, the bankruptcy court complied with the rules in the Fifth Circuit regarding assessing the merits of claims surrendered in a settlement agreement.

2.    The Complexity and Likely Duration of the Litigation and Any Attendant Expense, Inconvenience, or Delay

The record also demonstrates that the bankruptcy court considered the complexity and likely duration of the pending litigation by OLP and the attendant expense, inconvenience, and potential delay deriving from that litigation.

The bankruptcy court was presented with testimony that "over the course of this case," OLP has "taken the position . . . that [its] claims for administrative rent . . . continually increase[]," and

-19-

there is "[n]o reason to think that [OLP] won't" "assert the maximum amount of claim it thinks it's entitled to" if the Settlement Agreement is not approved. Doc. 2-3, R., 618–19. Moreover, the settlement would involve the waiver of a pending appeal by OLP regarding the "payment of property taxes" where "[a]lmost $100,000" is at issue. *Id.* at 619.[4] Thus, according to Mr. O'Halloran, entering the settlement agreement would "save the Debtors additional litigation costs." *Id.* Finally, ending the litigation by OLP against Debtors would ensure that the living facility would not have to close, mitigating the need for the elderly residents to move. Doc. 2-3, R., 620. Ultimately, Mr. O'Halloran testified that in Debtors' "business judgment," the settlement agreement was "a good result for the Debtors" because "it allow[ed] for the continued care of the tenants in the facilities without interruption" and it "reduce[d] potential claims that could have existed against the estate[.]" *Id.* at 616–17.

In approving the settlement, the bankruptcy court expressly recognized that "there was a lot of litigation leading up to th[at] point, and th[e] settlement [would] avoid[] further burdensome and expensive and lengthy litigation with OLP, not the least of which was an appeal that [would] be resolved regarding certain tax liability with regard to th[e] compromise." *Id.* at 637. Moreover, the bankruptcy court noted that a "two[-]million dollar administrative expense claim assertion is eliminated with th[e] compromise." *Id.* Finally, and "most important[ly]," the settlement would avoid "potential closure of this facility and peace for the residents with a new operator coming in." *Id.*

---

[4] OLP suggests there was up to $300,000 in dispute in the pending tax appeal. Doc. 7, OLP Br., 4.

Accordingly, it is clear that in approving the settlement, the bankruptcy court considered the complexity of the pending litigation and the expense it caused the estate. Thus, the bankruptcy properly considered the second *Foster Mortgage* factor.

    3.    <u>Amount of Creditor Support</u>

The record also demonstrates that the bankruptcy court considered the amount of creditor support for the Settlement Agreement. At the hearing, counsel for Harden alerted the bankruptcy court that Harden was "not the only creditor objecting" to the Settlement Agreement and that "CapStar partners, . . . a large group of large creditors, joined in [Harden's] objection." *Id.* at 603. But counsel for Harden then clarified that "CapStar Partners is a group of security holders that used to own Harden," and that its investors still "indemnif[y] Harden from claims like" those brought by OLP. *Id.* Thus, the bankruptcy court was not only apprised of which creditors objected to the Settlement Agreement, but it also understood those creditors' interest in lodging objections. On this record, the Court is satisfied that the bankruptcy court adequately considered the amount of creditor support under *Foster Mortgage*.

    4.    <u>Result of Arms-length Bargaining and Not of Fraud or Collusion</u>

Importantly, Harden does not argue that the Settlement Agreement results from fraud. *See generally* Doc. 3, Harden Br. In any event, with respect to whether the Settlement Agreement was the result of arms-length bargaining, counsel for Debtors stated that Debtors "rest on [Mr. O'Halloran's] declaration and the representations" therein. Doc. 2-3, R., 631. During the course of the hearing, Mr. O'Halloran confirmed under oath that he had reviewed the declaration and that "everything in [it is] true and correct[.]" *Id.* at 610. Moreover, the Court confirmed that it "ha[d] the declaration" before it and would accept it as "some testimony." *Id.* at 609. Mr. O'Halloran's

declaration represents that "[t]he Settlement Agreement was a product of extensive, arms-length bargaining between the Debtors and OLP" and "provides a fair resolution in light of the legal and economic risks to the Debtors." *Id.* at 550. On this record, the Court is satisfied that the bankruptcy court considered whether the Settlement Agreement was a result of arms-length bargaining and not of fraud or collusion.

In sum, the record establishes that the bankruptcy court satisfied its obligations under *Foster Mortgage* in approving the Settlement Agreement. Overall, the Court finds that the settlement is fair, equitable, and in the best interest of the estate. Thus, the bankruptcy court did not abuse its discretion in approving it.

## IV.

## CONCLUSION

For the foregoing reasons, the ruling of the bankruptcy court is **AFFIRMED** in all respects. This appeal is **DISMISSED WITH PREJUDICE**.


SO ORDERED.

SIGNED: February 18, 2021.


JANE J. BOYLE
UNITED STATES DISTRICT JUDGE

-22-